854

## GOODMAN v. UNITED STATES.
### No. 9989.

Circuit Court of Appeals, Ninth Circuit.

June 12, 1942.

Rehearing Denied July 10, 1942.

Leo Goodman and M. Seaton Cohen, both of Los Angeles, Cal. (Max Bergman, of New York City, of counsel), for appellant.

Wm. Fleet Palmer, U. S. Atty., and Leo V. Silverstein and A. Andrew Hauk, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before MATHEWS, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

Goodman is appealing from a judgment pronounced against him after conviction under an indictment charging him with conspiring with Takizawa, Nakauchi, Takahashi, Yamaguchi and Keeler to export industrial diamonds from the United States to Japan without a license, in violation of 50 U.S.C.A. Appendix, § 701[1] and the Presidential Proclamation of July 2, 1940.[2]

---

[1] Section 701, Title 50 U.S.C.A. Appendix, was enacted on July 2, 1940. Its pertinent provisions are as follows: "Whenever the President determines that it is necessary in the interest of national defense to prohibit or curtail the exportation of any military equipment or munitions, or component parts, thereof, or machinery, tools, or material, or supplies necessary for the manufacture, servicing, or operation thereof, he may by proclamation prohibit or curtail such exportation, except under such rules and regulations as he shall prescribe."

[2] On the same day as § 701, 50 U.S.C.A. Appendix, was enacted, the President took the following action under the statute: (1) He issued a Military Order designating Brigadier General Russell L. Maxwell as Administrator of Export Control, and (2) he issued a Presidential Proclamation (No. 2413) providing, among other things, as follows: "Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, acting under and by virtue of the authority vested in me by said Act of Congress, do hereby proclaim that the administration of the provisions of section 6 of that act is vested in the Administrator of Export Control, who shall administer such provisions under such rules and regulations as I shall from time to time prescribe in the interest of the national defense.

"And I do hereby further proclaim that upon the recommendation of the aforesaid Administrator of Export Control, I have determined that it is necessary in the interest of the national defense that on and after July 5, 1940, the articles and materials hereinafter listed shall not be exported from the United States except when authorized in each case by a license as hereinafter provided: * * *

"i. Industrial diamonds. * * *

"And I do hereby empower the Secretary of State to issue licenses authorizing the exportation of any of the said articles and materials the exportation of which is not already subjected to the requirement that a license be obtained from the Secretary of State authorizing their exportation and I do.

The principal ground urged by the appellant for a reversal relates to the sufficiency of the evidence to sustain the verdict. We briefly summarize the evidence upon which the Government relies:

Appellant is a native citizen of the United States and was engaged in the import-export business for a number of years.

Takahashi had been traveling between the United States and Japan since 1907, in connection with his [Takahashi's] business of importing and exporting various articles of merchandise between the two countries.

Takahashi and appellant first met in 1937, and since then appellant has acted as broker in several instances in the purchase of merchandise by Takahashi in connection with the latter's export business. These purchases were principally old silk stockings which were purchased for remanufacture in Japan.

In June, 1941, Takahashi informed appellant that he had an order from Japan for industrial diamonds and suggested that appellant purchase them for him. Takahashi asked appellant to obtain an export license and appellant said he would try.

Appellant had never dealt in this merchandise but through the telephone directory located a firm that dealt in various kinds of abrasives including industrial diamonds.[3] Appellant purchased some samples from this firm, dealing directly with Keeler, the manager of its abrasive department, which samples he delivered to Takahashi. Takahashi, being dissatisfied with the quality and color of the samples, accompanied appellant to the abrasive company's place of business, where the two talked with Keeler. Takahashi told Keeler that he had received an order from Japan for the diamonds, but knowing nothing about them himself he would trust Keeler, and gave an order for some more samples. Keeler ordered the diamonds from New York and delivered them in Los Angeles about July 7, 1941. Between July 7 and October 1, 1941, there were six sales of industrial diamonds by the firm and those sold were delivered to Takahashi in Goodman's presence.

Sometime in July and after Takahashi had made one or two purchases of industrial diamonds, another Japanese, Takizawa, went to Keeler, showed him a copy of a list which Keeler had previously given appellant, and asked Keeler about prices for industrial diamonds. Keeler told Takizawa that other people, including Takahashi, were placing orders for diamonds, and asked him who gave him the list. Takizawa did not reply. Keeler told Takizawa that it would be all right if he and Takahashi were going to purchase diamonds together.

The next time Keeler saw Takahashi and appellant he told them about Takizawa's visit. Takahashi said that Takizawa was

hereby authorize and enjoin him to issue or refuse to issue licenses authorizing the exportation of any of the articles or materials listed above in accordance with the aforesaid rules and regulations or such specific directives as may be, from time to time, communicated to him by the Administrator of Export Control."

On March 15, 1941, the President issued an executive order, effective April 15, 1941, prescribing additional regulations governing the exportation of articles enumerated in the proclamation of July 2, 1940. Among these regulations is the following:

"8. The original license must be presented, prior to exportation, to the collector of customs at the port through which the shipment authorized to be exported is being made. If shipment is made by parcel post, the license must be presented to the postmaster at the post office at which the parcel is mailed."

The Administrator of Export Control at the same time issued the following "Information Regarding the Exportation of Articles and Material Subject to License" [pp. 25-32 of "Export Control Regulations and Export Control Schedule No. 1" published by the Administrator of Export Control, effective April 15, 1941]:

"4. Who May Apply.

"a. Applications may be made by a corporation, partnership, individual, or their duly authorized agent, who is in fact the exporter of the goods, except when the proposed shipment consists of unused metal working machinery, in which case applications must be made by the manufacturer * * *.

"5. When To Apply.

"a. Applications may be made at any time prior to the clearing of the goods through the port of exit."

[3] Industrial diamonds differ from gem diamonds in composition. Their value depends upon the degree of hardness. They are used for a number of purposes in mechanical work, such as lapping, truing, grinding wheels, making diamond saws, cutting vitreous ware, lapping tools, boring tools, and the like.

one of his associates. Keeler then said that he would prefer that Takahashi and Takizawa purchased material together and credited appellant with the sales, so that there would be no friction between the two.

In August Takizawa met Takahashi, appellant and Keeler at the abrasive company's place of business and there and then Takahashi complained that the quality of the merchandise was not very good, saying that there was a big order coming from Japan and he wanted Keeler to be very careful about the quality.

Keeler then went to Chicago, selected the diamonds and had them shipped to his company's bank at Los Angeles. Takahashi and Takizawa in Goodman's and Keeler's presence, viewed the merchandise and accepted a part of it. Some time thereafter Keeler took the diamonds from the vault in the bank and drove with appellant to appellant's office, where Takahashi, Takizawa and Nakauchi subsequently arrived. After some conversations Takahashi took the balance of the diamonds, paid appellant $8,000 and appellant in turn gave Keeler a check for the same amount.

The only evidence with respect to the disposition of the diamonds purchased not so far related is as follows:

The sample diamonds purchased by appellant at his first meeting with Keeler were kept by Takahashi. Takahashi returned some of the other diamonds to the abrasive firm and received credit. He testified that he did not send any of them away.

On one occasion Nakauchi received three packages of diamonds from Takahashi or Takizawa and put them on a shelf in his store in Gardena. These three packages were taken from that shelf by an agent of the Federal Bureau of Investigation.

Nakauchi also testified that Takahashi or Takizawa once gave him a bag or portable phonograph and told him that it contained diamonds, and that he [Nakauchi] left the bag in a hotel room in San Francisco. He had driven to San Francisco with a friend who was returning to Japan. There is nothing in the evidence to identify this friend, and there is no further testimony as to the disposition of the diamonds.

None of the defendants had a license to export diamonds to Japan.

Appellant urges, first, that under the case of United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, affirming 2 Cir., 109 F.2d 579, the conviction must be set aside on the theory that [quoting from appellant's brief] "one who supplies legitimate articles with knowledge that the purchaser intends to use them for criminal purposes does not thereby become a co-conspirator with the purchaser".

It is urged by appellant that the most that the evidence discloses is that he acted as broker in obtaining the diamonds and that even though he might have had knowledge of a conspiracy to use them for an illegal purpose, such knowledge would not make him a co-conspirator.

But the Falcone case does not lay down such a broad principle of law. Instead the Court pointed out in that case that there was nothing therein to indicate that the defendant had knowledge of a conspiracy to violate the law and held that one cannot become a member of a conspiracy without knowledge of its existence.

Nevertheless we are of the opinion and hold that the conviction of the appellant must be set aside, for the reason that the record is devoid of evidence from which it could be inferred that he had any knowledge of an illegal conspiracy. In this respect the case is similar to the Falcone case, supra.

We have hereinbefore in footnotes 1 and 2 quoted the applicable sections of the law, from which it appears that at the time involved there was nothing unlawful in exporting diamonds to Japan, provided, however, the exporter obtained a license to do so at some time "prior to the clearing of the goods through the port of exit." Even if the appellant did know the ultimate destination of the diamonds, there is not a word from which the jury could properly infer that he knew they were to be exported without a license. The only expression in the evidence upon the subject was from Takahashi who suggested that appellant help him procure a license, and this, of course, is far from evidence that it was the intent that no license should be obtained. The evidence creates no more than a suspicion.

Reversed.

HEALY, Circuit Judge dissents.